[No. 1413.]

JOHN GORDON v. THE STATE.

PRACTICE—JUDGMENT NUNC PRO TUNC.—The trial court having failed to
enter final judgment in a felony case at the trial term, it has not the
power at a succeeding term to enter such judgment *nunc pro tunc*, nor
to entertain a motion for such purpose, unless the defendant be person-
ally present in court. See the case of *Mapes v. The State, ante*, p. 85, for
the subject elaborated.

APPEAL from the District Court of Live Oak. Tried below
before the Hon. D. P. Marr.

The indictment charged the appellant with the murder of
George Boselle, in Live Oak county, on the twenty-fourth day
of December, 1881. He was convicted of murder in the second
degree and was awarded a term of fifty years in the peniten-
tiary.

L. S. Slaughter, the father-in-law of the deceased, testified, for
the State, that he was on his rancho in Live Oak county, on the
twenty-fourth day of December, 1881, when the defendant ar-
rived there. The deceased and a man named Thomas were at
the lot at that time, working with a wild horse. The defendant
spoke in a friendly manner, and asked if Boselle was ready to
go with him to Oakville. The witness replied that the deceased
had abandoned his intention of going to town. Presently the
deceased and Thomas came to the house, and the defendant
asked deceased if he was going to town, and the latter replied
that he was not. The witness mounted his horse and proposed
to defendant that they should go to town. The defendant then
asked the deceased about his, the defendant's, rope. The de-
ceased replied that the rope was on the young horse, and started
to get it, the defendant following him. The witness had started
to the house to light his pipe, and when he had progressed
about half way, he looked back and saw the defendant shoot
the deceased. The deceased, when he was shot, had turned
to go away from the defendant. The deceased made one step
after he was shot by the defendant, and fell.

After the defendant shot the deceased, he pointed his gun,

cocked, towards the house. The witness picked up Alsup's gun and tried to shoot the defendant, but the gun snapped. The defendant then ran off, leading his horse, but at a distance of about forty yards he mounted his horse and rode off in a gallop. F. J. Browning, Columbus Davis, James Thomas, James Nichols, Robert Alsup, Mrs. Polly Slaughter, Mrs. Sallie Boselle and R. S. Gordon were at the house. The deceased was shot in the back, the ball entering about the right shoulder blade and coming out under or in front of the left arm. The deceased died, on the first of January, 1882. The witness did not see Dick Gordon at his house after the shooting.

The witness heard no further conversation between the deceased and the defendant than that detailed about the rope. When the defendant first spoke to the deceased, he spoke in a friendly manner. The witness heard nothing said between the parties at the instant of the shooting. The witness did not know positively of any previous disagreement between the deceased and the defendant, but knew that there was a coolness between them. They sometimes met without speaking.

Mrs. Sallie Boselle, the widow of the deceased, testifying for the State, detailed the incidents and conversation preceding the shooting very much as they were related by Slaughter. She saw the defendant when, the parties having gone together towards the horse lot, he drew his pistol and shot the deceased in the back. She heard nothing said by either of them at the time. After the deceased was shot, he told the witness that he would die. He was in his right mind. He voluntarily told the witness that he did not know why John Gordon shot him. The witness's father, Mr. Slaughter, sent for Doctor Dilworth to attend the deceased.

The witness stated that the defendant spoke, on that morning before the killing, in a usually friendly manner, and for a time sported with the children. He and the deceased appeared friendly just before the shooting, but some time before that they were not friendly, and met sometimes without speaking. If the witness's father had a gun, the witness did not see it. Doctor Dilworth first called to see the deceased on Sunday, the day after the shooting. The witness did not know whether the doctor probed the wound or not, but he prescribed a corn-meal poultice for the wound. The witness's mother was in the yard washing a pot when the shooting occurred.

Doctor J. P. Reagan testified that he first saw the de-

ceased after he was shot on the twenty-sixth or twenty-seventh of December. He probed the wound, and found that it penetrated the spinal column, paralyzing the body from the wound down. Boselle died from the effects of that wound. It was the conclusion of the witness, when he first saw the wound, that the deceased could not survive it. A very skillful surgeon might have been able to have prolonged life a few days if he had taken charge of the case at once, but the ultimate issue would have been death. Correct practice would not have prescribed healing poultices to such wounds. The witness was informed that Doctor Dilworth had prescribed watermelon seed tea, which tends to increase the secretion of urine, and was improper in this case.

Mrs. Polly Slaughter testified that she was in the yard, and saw all that transpired from the time of the defendant's arrival until he shot the deceased, and she detailed all the occurrences very much as they were detailed by Mr. Slaughter and Mrs. Boselle.

Wm. Clark testified, for the State, that he nursed the deceased after he was wounded. The deceased said that he was going to die; that he had no hope of recovery, and voluntarily, and not in answer to any questions propounded by the witness, declared that the defendant did not give him the showing of a dog, but murdered him in cold blood. Doctor Dilworth made for the deceased a poultice of live oak bark and meal, but it did not stay on the deceased long. The witness took it off, and in that did not follow Doctor Dilworth's directions. The witness, as deputy sheriff of Live Oak county, arrested the defendant in Frio county on the third day of January, 1882.

James Thomas testified, for the State, that he was present at the killing. After the parties returned from the house towards the horse lot they engaged in a conversation about a rope. The defendant asked the witness something about a rope, and the deceased told the defendant that he had already told him all about the rope, and that he, the defendant, must ask nothing more about it. Thereupon the deceased started towards the defendant with his fists closed, and the defendant threw his hand to his pistol. The deceased then turned, saying: "Don't you draw that d——d thing on me," and as the deceased turned the defendant shot him.

A little before the killing the deceased kicked over a large hip bone of the skeleton of a cow, but made no effort to pick it up,

and had passed it before the defendant shot.    The deceased was a very large and the defendant a small man.    The deceased was not armed at the time of the shooting.

The defense first read in evidence the testimony of R. S. or Dick Gordon, taken before the examining trial, as follows:

"I was at Slaughter's rancho on the twenty-fourth day of December, 1881, when George Boselle was killed.    The fuss commenced about a lariat and two ropes.    John Gordon said to George: 'You had better let me have my rope.    I am ruining your lariat.'    Boselle said: 'Your rope is on that young horse tied out yonder.'    Boselle turned and got another rope and brought it to John, and John told him that was the rope he let James Thomas have.    George Boselle said 'You are a God d——d liar.    You came here to steal a ·rope.    That is not your rope.'    They went out to where the horse was, and were parleying, but what then passed between them, I don't know.    Mr. Slaughter was sitting on his horse when the fuss commenced.    I did not see the shooting, as I was watching Slaughter.    Mr. Slaughter got down off of his horse, and I said: 'Slaughter, let's stop that fuss.'    He replied: 'I will stop John Gordon with my Winchester.'    He went and picked up his Winchester, and tried to shoot it three times.    I think he snapped it once while John Gordon and Boselle were quarreling, and twice after John Gordon started off.    From the way Boselle fell, he was going in a direction a little above the horses.    I am not certain, but think Boselle was in his shirt sleeves."

Cross-examined:

"I did not know why Slaughter's gun did not fire.    There were cartridges in the gun.    I saw some of themf all on the ground. Slaughter got down off his horse, and walked to the gallery and got his gun.    I staid there until Boselle was carried into the house.    I did not see the wound examined.    I staid the night before at Slaughter's, and was there all the morning.    I was standing five or six feet from the gallery.    There was very little difference in the distance of Slaughter and myself from the parties when the quarrel commenced.    Slaughter picked up the gun before John shot Boselle."

Testifying for the defense, Columbus Davis said that he heard none of the conversation between the deceased and the defendant, but from where he was sitting, near the crib, he saw them facing each other, and saw the defendant draw his pistol and shoot the deceased just as the latter turned off.    When the wit-

ness went to the deceased, he saw a gun lying by him, cocked. He saw Slaughter with a gun about the time Gordon was going off. The witness was looking at Gordon all the time after the shooting, and did not see him point his pistol towards the house.

Robert Alsup testified, for the defense, that the first he saw of the difficulty the deceased advanced on the defendant with a rope in his hand, and said: "I told you not to come here asking about a rope." The defendant put his hand on his pistol, and told Boselle not to "crow" over him. After he shot, the defendant ran off, but the witness did not see him point his pistol towards the house.

T. J. Browning testified, for the defense, that he was present on the morning of the difficulty, but heard nothing that was said until he heard the deceased say: "G—d d—m your h—ll fired heart, don't you pull it." He did not see the pistol fire, but saw the deceased fall.

The defendant's motion for a new trial was overruled, and he appealed. In the opinion of this court a statement will be found of the subsequent procedure in the cause and the facts relevant to the ruling now made.

*Eckford & Newton,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J. At the May term, 1882, of the District Court of Live Oak county, the appellant was convicted of murder in the second degree, and his punishment was assessed at confinement in the penitentiary for a period of fifty years. From this judgment he appealed to the Austin term of this court, where his appeal was dismissed for the want of a final judgment.

Before the commencement of the October term, 1882, of the District Court of Live Oak county, the district attorney gave notice to the appellant that, at the October term, he would move that judgment *nunc pro tunc* be entered. The appellant demanded in writing that he be present when the motion should be heard. The appellant was then confined in the Bexar county jail, and was in that jail when the motion was heard, and the judgment *nunc pro tunc* was entered.

This was error. The appellant had the right to be present. In fact the court had no legal right to entertain the said motion, nor to enter the said judgment, in the absence of the defendant.

See this subject fully discussed in *Mapes* v. *The State,* decided at this term.

There being no final judgment in this case, the appeal is dismissed.

*Appeal dismissed.*

Opinion delivered November 15, 1882.